Case 3:24-mj-00614-RMS   Document 1-1   Filed 07/10/24   Page 1 of 18

United States District Court
District of Connecticut
FILED AT NEW HAVEN

_____7/10_____,20_24_

By__N. Langello_____
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH A CELLULAR DEVICE ASSIGNED PHONE NUMBER 720-471-0396 | Case No. 3:24mj____614_____(RMS)<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS AND ORDERS PURSUANT TO 18 U.S.C §§ 3122 AND 3123

Evan Poisson, being first duly sworn, hereby depose and state as follows:

**I.     REQUESTED AUTHORIZATIONS**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) authorizing the collection of both historical and prospective location information regarding the following cellular device:

    a. Cellular device assigned 720-471-0396 (hereinafter "**TARGET TELEPHONE**"), which is serviced by Verizon Wireless, with an unknown subscriber, and believed to be used by Timothy GREGORY.

2. Based on the facts contained in this Affidavit, I submit that there is probable cause to believe and I do believe that the search warrant will reveal evidence, instrumentalities, contraband, or fruits of violations of federal law by the holder of **TARGET TELEPHONE** and others, specifically, violations of 18 U.S.C. §§ 922(a)(5) (Unlawful Transfer of Firearms to an Out-of-State Resident), 922(d) (Unlawful Sale or Transfer of Firearms), 933(a) (Trafficking in Firearms) (hereafter referred to as the "TARGET OFFENSES").

3. The information to be searched regarding **TARGET TELEPHONE** is described in the following paragraphs and in Attachment A, incorporated.

4. The requested historical cell site data and precise location information (including E-911 Phase II data, prospective cell site data, and communication detail records) is described in further detail below and in Attachment B, incorporated.

5. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

6. Based on my training and experience, and for all the reasons set forth herein, I submit that probable cause exists to believe that the requested historical cell site and precise location information described in Attachment B will constitute or lead to evidence of offenses involving the TARGET OFFENSES, as well as the identification of individuals who are engaged in the commission of the TARGET OFFENSES.

7. Since this Affidavit is being submitted for the limited purpose of authorizing the government to obtain historical information and prospective location described in Attachment B, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for the proposed warrant.

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## II.    AGENT TRAINING & BACKGROUND

9.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws as duly authorized by the Attorney General to request a search warrant.

10.    I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since August 2023. I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia. During my training at the FBI Academy in Quantico, Virginia, I received instruction on a variety of investigative and legal matters, to include searches, the drafting of search warrant affidavits, and probable cause. I am currently assigned to the New Haven Division of the FBI, where I have been tasked with investigating violent criminal street gangs involving the smuggling, distribution, and sale of drugs. Prior to becoming an FBI Special Agent, I was a police officer for seven years in Fairfax County, Virginia. As a police officer, I investigated numerous violations of law, including drug distribution, violent street crimes, and firearms offenses. During my career in law enforcement, I have arrested and interviewed subjects of violent criminal street gangs. I have also spoken to other local, state, and federal law enforcement officers regarding the methods employed by narcotics and firearms traffickers to avoid detection by law enforcement.

11.    Based on my training and experience, I know that narcotics and firearms traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am

3

familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons or businesses and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done to avoid detection and thwart the efforts of law enforcement.

### III.   PROBABLE CAUSE

12.   The Federal Bureau of Investigation (FBI) New Haven Safe Streets Gang Task Force (SSGTF) is investigating the commission of the TARGET OFFENSES by GREGORY, a.k.a. "Zombie." During April 2024, an FBI Confidential Human Source (hereafter "CHS-1"), reported that "Zombie" is willing to traffic firearms to Connecticut from the Arizona area. CHS-1 has a prior criminal history that involves convictions for Risk of Injury, Probation Violation, and Reckless Endangerment.  CHS-1 has been determined to be credible and reliable based on the ability of law enforcement to corroborate the information he/she provided.

13.   Investigators identified "Zombie" as GREGORY and determined that GREGORY was utilizing the Facebook account with the user ID "timothy.bennit" (hereafter the "TARGET ACCOUNT"). The TARGET ACCOUNT is viewable by the public and GREGORY posted screenshots of his Venmo/Paypal accounts that carry the name "Timothy Gregory." Using various databases, investigators located a Colorado Driver's License photograph of GREGORY. Investigators confirmed that the Driver's License photograph matched the individual in the photographs posted from the TARGET ACCOUNT. On or around April 8, 2024, CHS-1 contacted GREGORY via Facebook messenger/Facebook video chat on the TARGET ACCOUNT and

GREGORY discussed mailing firearms to CHS-1 through the United States Postal Service (USPS) to Connecticut. During these conversations, CHS-1 advised GREGORY that he/she is a convicted felon and therefore is a prohibited possessor. GREGORY indicated that he would still mail firearms to CHS-1 despite this fact. CHS-1 told investigators that the individual in the photographs from the TARGET ACCOUNT is the individual who he spoke with via Facebook video chat.

14. During May 2024, CHS-1 facilitated the purchase of a pistol from GREGORY at the direction of Agents. GREGORY mailed a package via USPS from a post office in New Mexico to a United States Postal Inspection Service (USPIS) mailing address provided by CHS-1 to GREGORY. GREGORY sent CHS-1 the tracking number from the TARGET ACCOUNT for the package and advised CHS-1 that it contained a handgun and three magazines.

15. On or around May 14, 2024, investigators intercepted this package and examined the contents with USPIS Special Agents. The package contained a Glock 42 .380 caliber pistol and three magazines. CHS-1 contacted GREGORY at the TARGET ACCOUNT and told him that the package was received. CHS-1 thereafter facilitated the payment of $400 in U.S. Currency upon receipt of the pistol. CHS-1 met with a mutual associate of GREGORY in Connecticut and provided him with $400 in U.S. Currency. The mutual associate then paid GREGORY $400 through the Venmo mobile payment application. Investigators know that GREGORY uses a Venmo account with the username "@timmaaay1808" and the display name "Timothy Gregory." CHS-1 then provided investigators with a screenshot of the Venmo transaction, confirming that GREGORY received the $400 for the firearm. GREGORY told CHS-1 that he has more firearms for sale, specifically fully automatic weapons. GREGORY sent CHS-1 photographs of what appeared to be fully automatic weapons via Facebook messenger from the TARGET ACCOUNT.

16. On or around May 15, 2024, CHS-1 contacted GREGORY at the TARGET ACCOUNT and told GREGORY that he/she is interested in purchasing fully automatic firearms. GREGORY stated that he could not send those through the mail and would instead drive them to Connecticut. GREGORY told CHS-1 that he will be driving to Connecticut to deliver approximately seventy-five (75) pounds of marijuana to a friend within the next two months. GREGORY advised CHS-1 that he currently plans to drive from New Mexico to Connecticut with approximately seven automatic firearms and 75 pounds of marijuana.

17. On or around June 13, 2024, CHS-1 discussed purchasing additional firearms through the mail from GREGORY via the TARGET ACCOUNT. GREGORY told CHS-1 that he could build four .45 caliber pistols and mail them to Connecticut. At the direction of agents, CHS-1 wired $2,500 in U.S. Government funds to GREGORY to pay for the four pistols up front. On or around June 19, 2024, GREGORY contacted CHS-1 and advised that the order for the pistol parts was delayed. GREGORY told CHS-1 that he could send an AR15 style rifle for free due to the delayed pistol order. On or around June 20, 2024, GREGORY mailed a package via USPS from a post office in New Mexico to a USPIS mailing address provided by CHS-1 to GREGORY. GREGORY sent CHS-1 the tracking number for the package from the TARGET ACCOUNT and advised CHS-1 that it contained a rifle and two thirty round magazines.

18. On or around June 24, 2024, investigators intercepted this package and examined the contents with USPIS Task Force Officers (TFOs). The package contained a .223 caliber AR15 style rifle with two empty thirty round magazines. The rifle was broken down into the upper and lower receiver within the package. CHS-1 contacted GREGORY via the TARGET ACCOUNT and advised him that the package was received. GREGORY told CHS-1 that he was awaiting

delivery of the pistol parts. GREGORY also told CHS-1 that he is planning to go to Colorado on or around July 13, 2024, to retrieve more firearms before traveling to Connecticut.

19. On or around June 26, 2024, GREGORY told CHS-1 via the TARGET ACCOUNT that he has up to 300 weapons, some of which are fully automatic, hidden in a mine shaft in Colorado. GREGORY also asked CHS-1 if he/she wants six hand grenades. After this conversation, agents determined that GREGORY will be apprehended in Colorado in the interest of public safety.

20. During the week ending on July 5, 2024, agents directed CHS-1 to contact GREGORY at the TARGET ACCOUNT and ask if his/her associate in Colorado (an undercover agent) could meet with GREGORY to pick out firearms from the mine shaft. GREGORY agreed to this proposal and told CHS-1 that he wanted to sell all his firearms so he could leave the country. GREGORY told CHS-1 that his/her associate can contact him on the **TARGET TELEPHONE** to discuss the transaction. GREGORY also provided CHS-1 with an address in Boulder, Colorado, for the associate to meet GREGORY. An FBI Undercover Employee (hereafter "UCE-1"), contacted GREGORY via the **TARGET TELEPHONE** and discussed the future transaction. GREGORY told UCE-1 that he expected the phone call and told UCE-1 that he wants to get rid of his "stuff" and move to Australia.

## APPLICABLE CELLULAR TELEPHONE TECHNOLOGY

21. I know that mobile phone providers have technical capabilities that allow them to collect and generate information about the locations of the mobile phones to which they provide service. Some of this information includes but is not limited to: (1) E-911 Phase II data, also known

as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records, and (3) Call Detail Records (CDRs).

22. In my training and experience, I have learned that Verizon Wireless (hereafter, the Wireless Provider) are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

23. Based on my training and experience, I know that the Wireless Provider can collect E-911 Phase II data about the location of the **TARGET TELEPHONE** including by initiating a signal to determine the location of the **TARGET TELEPHONE** on the Wireless Provider network or with such other reference points as may be reasonably available.

24. Based on my training and experience, I know that the Wireless Provider can collect cell-site data about the **TARGET TELEPHONE**. Based on my training and experience, I know

that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Wireless Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

25. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

26. Based on my training and experience, I know that the Wireless Provider can collect cell-site data about the **TARGET TELEPHONE**. I also know that wireless providers such as the Wireless Provider typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. CDRs are a type of these records, and they contain data regarding telecommunication transactions without providing the content of that transaction. In part, the data contained in these CDRs includes cell site information utilized during the transaction.

27. Based on my training and experience, I know that telephone companies, like the Wireless Provider also collect data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular

9

telephone accessing its network, providers such as the Wireless Provider use PCMD and other data to calculate and record the estimated location of that cellular telephone. The Wireless Provider refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call").

28.     Based on my training and experience, I know that telephone companies collect Radio Signal Strength Indicators (RSSI) data.  RSSI is a measurement of how well a device can hear, detect and receive signals from any wireless access point or Wi-Fi router.

29.     Based on my training and experience, I know that telephone companies also collect Media Access Control (MAC) addresses.  A MAC address is a unique identifier assigned to a network interface that allows communication on a physical network segment.

30.     Finally, I know that telephone companies collect Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location. Because every device that connects to the Internet must use an IP address, IP address information can help to identify location information.

## IV.    AUTHORIZATION REQUEST

31.     Based on the information set forth herein, I believe there is probable cause to believe that GREGORY and others are committing the TARGET OFFENSES.  I also believe that probable cause exists to believe GREGORY is using the **TARGET TELEPHONE** in furtherance of the TARGET OFFENSES.  I request that the Court issue the proposed search warrant pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

32.     I also request that the Court direct the Wireless Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with the Wireless Provider services, including by initiating a signal to determine the location of **TARGET TELEPHONE** on the Wireless Provider network, and at such intervals and times as directed by the government. The FBI will compensate the Wireless Provider for reasonable expenses incurred in furnishing such facilities or assistance.

33. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

34. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **September 8, 2024**, which will be approximately 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

35.     I further request that the Court authorize execution of the precision location warrant (Attachment B) at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours. Because the search warrant will be served on the Wireless Provider, who will then compile the requested records at a time convenient to the Wireless Provider, reasonable cause exists to permit the extraction of those records at any time in the day or night as well.

36.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may provide the search warrants to the Wireless Provider. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

EVAN POISSON
Digitally signed by EVAN POISSON
Date: 2024.07.10 14:25:05 -04'00'
_____
EVAN POISSON
FBI SPECIAL AGENT

Subscribed and sworn to me by telephone on July __10__, 2024 in New Haven, Connecticut.

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2024.07.10 15:22:06 -04'00'
_____
HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

Records and information associated with the cellular telephone assigned call number 720-471-0396 (**TARGET TELEPHONE),** with an unknown subscriber, and believed to be used by Timothy GREGORY, that is in custody or control of Verizon Wireless, a company that accepts process at 180 Washington Valley Road, Bedminster, NJ 07921.

## ATTACHMENT B

**I. Information to be Disclosed by Verizon Wireless**

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any information that has been deleted but is still available to Verizon Wireless or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose to the government the following information pertaining to the **TARGET TELEPHONE** listed in Attachment A for the time for the time period **of April 3, 2024, through the present, AND for the period extending 30 days from the date this warrant is issued.**

    a. The following information about the customers or subscribers of the account**:**

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifier (MEID); Mobile Identification Number (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Number (MSISDN); International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

        vii. Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the account including:

  i. The date and time of the communication, the method of the communication, and the source and destination of the communication;

  ii. Call detail records to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by **TARGET TELEPHONE**, for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to-mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits);

  iii. Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as all available per-call measurement data (PCMD), round-trip time "RTT" data, Historical Mobile Locators "NELOS," Timing Advance Information, Timing Advance Report Date, and True Call data.

  iv. Radio Signal Strength Indicators (RSSI) for the period of this Warrant, timing advance and other pertinent information delivered in real time with regard to neighboring towers as feasible;

  v. The MAC address to include Wi-Fi MAC address and/or the access point(s) to which of TARGET TELEPHONE 2 connects to the internet via wireless technology that allows computers and other devices to communicate over a wireless signal (commonly referred to as Wi-Fi), and packet data; and

  vi. All Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from **TARGET TELEPHONE**.

 c. All precise location information, including E-911 Phase II data, GPS data, and Latitude-longitude data.

In approving this warrant, the Court finds reasonable necessity for the seizure of the location information set forth above. *See* 18 U.S.C. § 3103a(b)(2). This warrant does not authorize the seizure of any tangible property or the contents of any communications.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 922(a)(5) (Unlawful Transfer of Firearms to an Out-of-State Resident), 922(d) (Unlawful Sale or Transfer of Firearms), 933(a) (Trafficking in Firearms)

(hereafter referred to as the "TARGET OFFENSES") involving the user of the **TARGET TELEPHONE** and the user's associates from April 3, 2024, through the thirty-day period from the date of the warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon Wireless, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon Wireless. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon Wireless, and they were made by Verizon Wireless as a regular practice; and

    b.    such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon Wireless in a manner to ensure that they are true duplicates of the original records; and

    2.  the process or system is regularly verified by Verizon Wireless, and at all times pertinent to the records certified here the process and system functioned properly and normally.

  I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
  Date            Signature